# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VIP MORTGAGE CORPORATION, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>BANK OF AMERICA, N.A. )<br>    Defendant, )<br>)<br>    and, )<br>)<br>TD BANK, N.A. )<br>    Defendant. ) | Civil Action No. 08cv10562-NG |

GERTNER, D.J.

### MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT
February 11, 2011

Plaintiff VIP Mortgage ("VIP") is a mortgage origination company that is no longer in business. Pl.'s Statement of Facts ("SOF") ¶ 1(document #73); Def. SOF ¶ 2 (document #70). It alleges that between April of 2005 and February of 2006, Mark Rhodes ("Rhodes"), the manager of its Stratford, Connecticut, branch office, deposited checks that were the property of VIP in the total amount of approximately $377,191.73 into an account that he created for this purpose. Pl.'s SOF ¶ 39. He had opened the sole proprietorship account in the name of *Mark Rhodes dba ("doing business as") VIP Mortgage* without proper documentation at Hudson United Bank which has since been acquired by the defendant, TD Bank ("Bank"). Id. ¶ 12, 21. The Bank was later notified that Rhodes was a suspect in another check fraud scheme, and it issued a security report in August of 2005 that indicated fraud in his accounts. Id. ¶ 44-47. The Bank closed Rhodes' dba VIP account six months later but never notified VIP of any suspicious activity.

VIP now seeks to hold TD Bank liable for this fraud and brings claims against the Bank for negligence under the common law and the Uniform Commercial Code ("UCC"), conversion,

civil conspiracy, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"). The matter is presently before the court on the parties' cross-motions for summary judgment. See Def.'s Mot. Summ. J. (document #68); Pl.'s Mot. Partial Summ J. (document #71). For the reasons that follow, I GRANT in part and DENY in part Defendant's Motion for Summary Judgment; and I DENY Plaintiff's Motion for Summary Judgment.

I. **BACKGROUND**

On April 4, 2005, Rhodes opened an account at Hudson United Bank in the name of "Mark Rhodes dba VIP Mortgage." Pl.'s SOF ¶ 12. At the time, he already had two accounts at the Bank, and his sister, Alicia Sadie ("Sadie"), was an employee there. Id. ¶ 10. Sadie in fact opened the account on his behalf. Id. ¶ 13. She did not demand, nor did he provide, a dba certificate as required by bank policy. Id. ¶ 17, 21, 30. See also Bank Policies, Pl.'s SOF, Ex. 12, 1169, 1198, 1006, 1015, 1210, 1211 (filed under seal). VIP Mortgage itself had no other dealings with Hudson United Bank. Def.'s SOF ¶ 34.

Between April 4, 2005 and February 10, 2006, Rhodes deposited a total of 52 checks that were payable to "VIP Mortgage" or "VIP Mortgage Corp." into this account. Pl.'s SOF ¶ 37-40. He endorsed the checks with either his dba account number, a statement "for deposit only," or a stamp stating "Pay to the Order of Hudson United Bank West Haven, CT, 06516-4408 021201503 for Deposit Only, Mark L. Rhodes dba VIP Mortgage." Id. ¶ 38.

On August 23, 2005, the State of Connecticut served a search warrant on the Bank regarding checks of another mortgage company that had been deposited into personal accounts of Rhodes. Id. ¶ 44. In response, Hudson Bank issued an Internal Security Incident Report on August 25. The Report states:

> The suspect is being investigated for depositing checks payable to other businesses/individuals into his account and most of the transactions have been done within the three year return possibility on forged endorsements. It seems that the suspect was able to, as indicated in the warrant, deposit these checks into his accounts with ease and I find that this is unusual as most experienced tellers will not accept checks payable to other businesses/individuals to be deposited into a wrongful account.
>
> . . . .
>
> It should be noted that there were numerous other questionable deposits made to these accounts at HUB Stratford . . . and the branch manager was notified to have their personnel scrutinize each of his deposits and not accept any items for deposit that are not payable to his accounts. Stratford Manager reports that he was able to determine that a Rhodes Account (ZIP Mortgage) [sic] is receiving large deposits which are being transferred into one of his personal accounts.

Security Incident Report, Pl.'s SOF, Ex. 18, at 2-3.

This report was forwarded to the Legal Department and Regional Managers, but the Bank otherwise conducted no further investigation. Pl.'s SOF ¶ 56. After the report, the Bank continued to accept for deposit into the Mark L. Rhodes dba account checks payable to VIP Mortgage Corporation and VIP Mortgage. Id. ¶ 65. The Bank finally closed the Rhodes dba VIP Mortgage account in February of 2006, six months after the incident report. Id. ¶ 64.

The fraud continued. After Hudson United Bank closed his account, Rhodes opened "Mark Rhodes dba VIP Mortgage" accounts at Bank of America, where he deposited thirty-three checks payable to VIP Mortgage Corporation and VIP Mortgage, totaling $185,372.61. Id. ¶ 85, 88. It was not until May of 2006 that VIP discovered the fraud when the State of Connecticut searched VIP Mortgage's offices in Stratford, CT and found seventy loan files and financial documents indicating illegal activity. Id. ¶ 90. VIP finally fired Rhodes on May 10, 2006. Id. ¶ 91.

The Defendant, in turn, presents evidence to suggest that VIP Mortgage should have known that Rhodes was of suspect character. He had previously been convicted of a cocaine conspiracy and had changed his name from Sadie to Rhodes. Def.'s SOF ¶ 18. He had lied on the application for a name change and said that he had not been convicted of any crime. Id. ¶ 19-20. He was subject to garnishment orders for unpaid child support obligations in Georgia. Id. ¶ 23. He also had a large federal tax lien against him, and that lien was growing. Id. ¶ 21. The defendant alleges that VIP was aware of all of these facts and yet hired him and continued his employ. Id. ¶ 24. They did not check his references. Id. ¶ 17. They did, however, check the references of Rhodes' associate, whom he brought with him from his former employer. The reference stated that she had been fired for "embezzlement." When VIP asked Rhodes about this fact, he stated that the employer was "just upset." And VIP hired her anyway. Id. ¶ 15-16 (document #70).

In March of 2006, an anonymous caller who called himself "Deep Throat" called VIP's principal, Gregory Deschenes, and told him that Rhodes was taking VIP checks and depositing them in his own bank accounts. Deschenes did not confront Rhodes or investigate further. Id. ¶ 27.

## II. DISCUSSION

Summary judgment is appropriate only when all of the pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Upon a motion by the defendant, the court may grant summary judgment where the plaintiff fails to bring proof of an element essential to its case. Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986). A plaintiff who moves for summary judgment has a higher burden. The court may grant summary judgment to the plaintiff only where the evidence is conclusive and no reasonable fact-finder could find otherwise. Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009).

When a federal court sits in diversity, it is to apply the substantive law of the state in which the injury occurred, or Connecticut in this case. See generally Cohen v. McDonnell Douglas Corp., 389 Mass. 327, 333 (Mass. 1983).[1] To apply Connecticut law, I am to make my "best guess" as to what the Supreme Court of Connecticut might decide. See Liberty Mut. Ins. Co. v. Metro. Life Ins. Co., 260 F.3d 54, 65 (1st Cir. 2001).

In this case, the plaintiff brings the following claims against TD Bank:

> I.   Violations of the common law and UCC for failing to exercise ordinary care in opening the dba account; accepting checks for deposit payable to VIP; and failing to close Rhodes' account after detecting fraud.[2] (Count I)
>
> ii.  Civil conspiracy for willful, wanton and reckless disregard of verification obligations. (Count III)
>
> iii. Violations of CT Unfair Trade Practices ("CUTPA") -- engaging in "unfair or deceptive acts or practices in the conduct of any trade or commerce" in violation of Conn. Gen. Stat. § 42-110b(a). (Count V)

---

[1]The parties agree that Connecticut law governs. See Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 623 F. Supp. 2d 98, 105-06 (D. Mass. 2009) ("Where parties have agreed to the choice of law, this court is free to forego an independent analysis and accept the parties' agreement").

[2]Although the Plaintiff does not specify these violations, they sound in common law negligence, violations of the UCC (Conn. Gen. Stat. § 42a-3-405(a)(2)), and conversion.

The plaintiff has moved for summary judgment on the first claim; and defendant has moved for summary judgment on all of the claims. I will consider each claim in turn.

### A. Negligence

The plaintiff brings negligence claims against the Bank for I) wrongfully opening the dba account without a certificate; ii) accepting checks payable to VIP Mortgage for deposit in Rhodes' dba account; and iii) failing to terminate the account for six months after it became aware that Mr. Rhodes was committing fraud through the Bank. The second negligence claim -- for unauthorized endorsements -- is preempted and governed by the UCC. See Conn. Gen. Stat. § 42a-3-405(b). The first and third claims, however, arise under general common law negligence.

#### 1. UCC -- Fraudulent Endorsements

The UCC, as adopted in Connecticut, covers fraudulent endorsements in an employer/employee relationship. See Conn. Gen. Stat. § 42a-3-405. According to the statute,

> "Fraudulent endorsement" means (I) in the case of an instrument payable to the employer, a forged endorsement purporting to be that of the employer, or (ii) in the case of an instrument with respect to which the employer is the issuer, a forged endorsement purporting to be that of the person identified as payee.

Conn. Gen. Stat. § 42a-3-405(a)(2). The first scenario (I) is the type of fraud in which Rhodes was engaged. The checks were payable to his employer, VIP Mortgage or VIP Mortgage Corp., and the bank allowed Rhodes to deposit them for his own benefit.

The statute specifically provides:

> For the purpose of determining the rights and liabilities of a person who, in good faith, pays an instrument or takes it for value or for collection, if an employer entrusted an employee with responsibility with respect to the instrument and the employee or a

> person acting in concert with the employee makes a fraudulent endorsement of the instrument, the endorsement is effective as the endorsement of the person to whom the instrument is payable if it is made in the name of that person. ***If the person paying the instrument or taking it for value or for collection fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss resulting from the fraud, the person bearing the loss may recover from the person failing to exercise ordinary care to the extent the failure to exercise ordinary care contributed to the loss.***

Id. § 42a-3-405(b) (emphasis added).

In other words, the statute generally allocates the risk of loss to the employer rather than to the bank for an employee's fraudulent endorsements so long as the bank exercised ordinary care. See Conn. Gen. Stat. § 42a-3-405(b). The comment explains:

> Section 3-405 adopts the principle that the risk of loss for fraudulent indorsements by employees who are entrusted with responsibility with respect to checks should fall on the employer rather than the bank that takes the check or pays it, ***if the bank was not negligent in the transaction***. Section 3-405 is based on the belief that the employer is in a far better position to avoid the loss by care in choosing employees, in supervising them, and in adopting other measures to prevent forged indorsements on instruments payable to the employer or fraud in the issuance of instruments in the name of the employer. If the bank failed to exercise ordinary care, ***subsection (b) allows the employer to shift loss to the bank to the extent the bank's failure to exercise ordinary care contributed to the loss***. "Ordinary care" is defined in Section 3-103(a)(9). The provision applies regardless of whether the employer is negligent.

Id., cmt. 1 (emphasis added). As a matter of policy, the drafters determined that an employer is in the best position to avoid loss by choosing upstanding employees, supervising them, and auditing their work. And yet where the bank breached its duty of care, the employer may shift some of the loss to the bank.

The Bank cites this statute for the proposition that the employer bears the entire risk of a

malevolent employee, and therefore that VIP Mortgage is entirely responsible for the loss it incurred by Rhodes' fraud. In a troubling omission, the Bank failed to cite the second half of § 42a-3-405(b), whereby *the risk is shared when the bank is negligent*. A reasonable jury in this case may find that the Bank failed to exercise ordinary care by allowing Rhodes to open the account without a dba certificate, by allowing him to deposit checks in the name of VIP Mortgage Corp. (which did not match the dba name of VIP Mortgage), and worse, by allowing him to continue to deposit checks at the Bank for six months after it had been notified -- and itself confirmed -- suspicious activity.

This is precisely the type of case for which the statute was created. Without a doubt, VIP was in the best position to monitor Rhodes. They should have been more careful in hiring, should have audited his work, and should have discovered the fraud earlier. And yet on the record before me, there is evidence that the Bank failed to exercise due care. It should have required a dba certificate to open the account, should have followed its own policies, and should have closed the account sooner. Whether these acts are sufficient to shift the blame to the Bank is a matter for a factfinder, and I therefore DENY both the plaintiff's and the defendant's motions for summary judgment on the claim regarding fraudulent endorsements.

### 2. Common Law Negligence

In addition to fraudulent endorsements, VIP brings claims for general common law negligence against the Bank for allowing Rhodes to open the dba account without documentation and for failing to investigate Rhodes' accounts after it became aware of specific and actual fraud. Common law negligence is the breach of a duty of care that directly and proximately caused harm to the plaintiff. For plaintiff to show negligence under Connecticut law, however, it must

malevolent employee, and therefore that VIP Mortgage is entirely responsible for the loss it incurred by Rhodes' fraud. In a troubling omission, the Bank failed to cite the second half of § 42a-3-405(b), whereby *the risk is shared when the bank is negligent*. A reasonable jury in this case may find that the Bank failed to exercise ordinary care by allowing Rhodes to open the account without a dba certificate, by allowing him to deposit checks in the name of VIP Mortgage Corp. (which did not match the dba name of VIP Mortgage), and worse, by allowing him to continue to deposit checks at the Bank for six months after it had been notified -- and itself confirmed -- suspicious activity.

This is precisely the type of case for which the statute was created. Without a doubt, VIP was in the best position to monitor Rhodes. They should have been more careful in hiring, should have audited his work, and should have discovered the fraud earlier. And yet on the record before me, there is evidence that the Bank failed to exercise due care. It should have required a dba certificate to open the account, should have followed its own policies, and should have closed the account sooner. Whether these acts are sufficient to shift the blame to the Bank is a matter for a factfinder, and I therefore DENY both the plaintiff's and the defendant's motions for summary judgment on the claim regarding fraudulent endorsements.

### 2. Common Law Negligence

In addition to fraudulent endorsements, VIP brings claims for general common law negligence against the Bank for allowing Rhodes to open the dba account without documentation and for failing to investigate Rhodes' accounts after it became aware of specific and actual fraud. Common law negligence is the breach of a duty of care that directly and proximately caused harm to the plaintiff. For plaintiff to show negligence under Connecticut law, however, it must

first allege that the defendant owed a duty of care to the plaintiff. Coburn v. Lenox Homes, Inc., 186 Conn. 370, 375 (1982). And here is where the plaintiff's common law claims for negligence fail.

Although the Supreme Court of Connecticut has not specifically addressed the issue, the vast majority of courts have held that banks are not liable to third parties at common law *because they do not owe a duty of care to non-customers*. See Lester Constr., LLC v. People's United Bank, 2009 WL 5698131, at *4 (Conn. Super. Ct. 2009) (A bank's duty to act with reasonable care in its transactions with customers arises out of the bank's contract with the customer."); Cammarota v. Cammarota, 2007 WL 2743429, at *2 (Conn. Super. Ct. 2007) ("In the context of negligence claims against banks, a bank owes a duty of ordinary care to its customers, or a 'person having an account with the bank or for whom a bank has agreed to collect items.'") (internal quotations and citations omitted). See also Fine v. Sovereign Bank, 634 F. Supp. 2d 126, 136 (D. Mass. 2008); Eisenberg v. Wachovia Bank, N.A., 301 F.3d 220, 225 (4th Cir. 2002) (collecting cases from many jurisdictions). And if there is no duty, there can be no breach, no matter how negligent the conduct seems. Id.

The plaintiff argues that the Supreme Court of Connecticut would not apply this rule and would instead find that a duty of care to non-customers arises out of public policy concerns. Significantly, most courts have found the opposite – that public policy requires such a rule to protect banks from unlimited liability. See Lerner v. Fleet Bank N.A., 459 F.3d 273, 286-87 (2d

Cir. 2006) (A bank owes no duty to non-customers under New York law, as it would make New York banks liable to the world's banking community.).[3]

Indeed, courts have found that a bank owes no duty of care to third-party non-customers where a dba account was fraudulently created in another's name and then used for fraudulent purposes. See, e.g., Software Design & Application Ltd. v. Hoeffer & Arnett, Inc., 49 Cal. App. 472, 481-82 (1996) (bank not liable to non-customer investors where agent opened account in name of principal and diverted principal's funds); MacCallum v. Rizzo, 1995 Mass. Super. Lexis 196, at *4-8 (bank not liable to third party lender to a campaign where campaign employee opened account in campaign's name without proper verification of authority and diverted funds). In these cases, the plaintiffs were third parties who were harmed by the fraud rather than the persons or entities actually named in the title of the account.

An argument could be made that however little a bank owes a non party customer, it does owe a duty to the entity in whose name the account was created, whether a customer or not. In Eisenberg, third-party investors sued the bank for allowing a fraudulent bank account to be opened in the name of Bear Stearns. The court specifically noted that while the bank did not owe a duty to a third-party non-customer, it might owe a duty to the person in whose name the fraudulent account was opened. 301 F.3d at 226 ("Bear Stearns would be the beneficiary of any duty of care which Wachovia might owe to a noncustomer."). See also Patrick v. Union State Bank, 681 So.2d 1364, 1371 (Ala. 1996) (bank owed duty of care to person in whose name the account was opened to ensure that the person opening the account is not an imposter). But see

---

[3]There are very rare exceptions to this general rule. New York, for example, has recognized a narrow exception to this rule where a bank knows of a depositor's breach of fiduciary duty with respect to a third-party non-customer. See, e.g., Lerner v. Fleet Bank, N.A., 459 F.3d 273, 287-88 (2d Cir. 2006); Fine, 634 F. Supp. 2d at 136..

Software Design, 49 Cal. App. at 479 (A bank is not liable to Software Design where a financial consultant embezzled money through a bank account he opened in the company's name because Software Design had no relationship with the bank).

The plaintiff, however, does not make this argument. And, in any case, the First Circuit has warned that "federal courts sitting in diversity should be cautious about 'push[ing] state law to new frontiers.'" Nicolaci v. Anapol, 387 F.3d 21, 27 (1st Cir. 2004) (quoting Kelly v. Marcantonio, 187 F.3d 192, 199 (1st Cir.1999)). As the Supreme Court of Connecticut has yet to decide the issue, I am not inclined to determine that Connecticut would carve out an exception to the now almost universal rule that banks do not owe a common law duty of care to third-party non-customers. I will not here "blaze a new trail." Taylor v. Aetna Cas. & Sur. Co., 867 F.2d 705, 706 (1st Cir.1989). I find that the Bank did not owe a duty of care to VIP because VIP was not a customer of the bank. As such, the Bank cannot be held liable for common law negligence.[4]

Accordingly, I DENY plaintiff's motion for summary judgment on common law negligence and GRANT defendant's motion for summary judgment on the same.

B. **Conversion**

The plaintiff next brings a claim for conversion. Connecticut General Statutes § 42a-3-420(a) states in pertinent part that:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or a bank makes or obtains payment with

---

[4] I should note also that the plaintiff is not without remedy. The Connecticut legislature provided for exactly these circumstances by allowing employers to partially recover where their employee committed fraud and the Bank failed to exercise ordinary care. See supra Part II(A)(2), and Conn. Gen. Stat. § 42a-3-405.

> respect to the instrument for a person not entitled to enforce the instrument or receive payment.

In this case, the Bank deposited checks from Rhodes, who was not entitled to enforce the instrument, and thus, the Bank may therefore be liable for conversion. A bank may be liable for conversion even where the bank had no intent to convert the funds. See Keyes Funeral Home, Inc. v. Sanders, 1992 WL 135399, at *3 (Conn. Super. Ct.).

Indeed, the defendant does not move for summary judgment on the substantive conversion claim, but only on the question of damages under the claim. According to Connecticut General Statutes § 42a-3-420(b), "In an action under subsection (a), the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument." The Bank argues that VIP is entitled only to its interest in the checks that were cashed -- an amount determined by VIP's contract with Rhodes. According to the employment contract, Rhodes was to receive all of the amounts received by the office, minus expenses and a small payment to VIP of .5% of the loans generated by the branch. See Employment Contract at ¶ 3, Def.'s SOF, Ex. K. The Bank argues that to the extent that it is liable, it is liable for VIP's interest in only a small percentage of the checks.

The defendant cites a factually similar case, Edwards v. Allied Home Mortg. Capital Corp., 962 So.2d 194 (Ala. 2007). In Edwards, an employer brought an action against a branch manager of a mortgage company who diverted checks payable to the company. The trial court did not allow the manager to argue that the mortgage company's interest in the checks was limited to the contractual percentage detailed in the employment contract between the parties. Id. at 205-06. The Supreme Court of Alabama reversed and held that it was error to preclude the evidence that the interest was limited to the contractual split. Id. The question in Edwards,

however, did not arise at summary judgment. The Supreme Court of Alabama merely held that the trial court should have allowed evidence that the plaintiff's interest was limited. Presumably the fact-finder would determine the plaintiff's actual interest. Plaintiff's argument, in short, is premature.

In this case, VIP's actual interest will depend on factual determinations of expenses and the purpose of various checks made out to VIP that were deposited in Rhodes' dba account. VIP contends that it owns 100% interest in the checks that were converted. VIP was expected to use these funds to pay the lease, office personnel, and other expenses. Some portion left over may have belonged to Rhodes. These are triable questions of fact.

I therefore DENY Defendant's Motion for Summary Judgment as to damages for plaintiff's conversion claim.

### C. Civil Conspiracy

The plaintiff further claims that the defendant committed civil conspiracy by enabling Rhodes to commit fraud. In Connecticut, to prove a civil conspiracy, a plaintiff must show (I) an agreement between two or more persons, (ii) to do a criminal or unlawful act or lawful act by criminal or unlawful means, (iii) an act by one or more of the conspirators in furtherance of the scheme, which results in (iv) damage to the plaintiff. Macomber v. Travelers Prop. & Cas. Corp., 277 Conn. 617, 635-36 (2006). There must be evidence of an underlying tort. Harp v. King, 266 Conn. 747, 779 n.37 (2003). Here, there is no evidence that the Bank agreed to Rhodes' actions. The Bank did not *intend* to be "duped" by Rhodes any more than the employer intended to be duped. There was no "meeting of the minds" between Rhodes and the Bank in furtherance of the conspiracy. It cannot be said that the Bank was a co-conspirator.

I GRANT summary judgment for the defendant on the civil conspiracy claim.

**D.     Connecticut Unfair Trade Practices Act**

Finally, the plaintiff claims that the Bank violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §42-110b by failing to close the account after the Security Incident Report and failing to notify ChexSystems of the fraud.  Had the Bank notified ChexSystems, a network check verification system that works with many banks, the defendant argues, Rhodes would never have been able to continue his fraud at Bank of America.

To assess liability under CUTPA, courts consider the "cigarette rule": (I) whether the practice offends public policy; (ii) whether it is immoral, unethical, oppressive, or unscrupulous; and (iii) whether it causes substantial injury to consumers.  <u>A-G Foods, Inc. v. Pepperidge Farm, Inc.</u>, 216 Conn. 200, 215 (1990).  "[A] violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy ."  <u>Willow Springs Condo. Assn., Inc. v. Seventh BRT Dev. Corp.</u>, 245 Conn. 1, 43 (1998) (internal quotation marks omitted).  Again, there is no clear rule in Connecticut courts as to whether negligence alone may rise to the level of a CUTPA violation.  See <u>Lester</u>, 2009 WL 5698131, at *7.  But it has been held that CUTPA does not apply to situations where a bank is duped in a check fraud scam.  <u>See, e.g.</u>, <u>Saint Bernard Sch. v. Bank of Am.</u>, 2009 WL 1624479 (Conn. Super. Ct. 2009).  Indeed, in a factually similar case offered by the plaintiff, <u>Lester</u>, the court found *no CUTPA violation* where a bank violated its own policies to allow a malfeasor to open an account in a third party's name and then accepted a series of fraudulent checks.  2009 WL 5698131, at *7.

It is true that in this case, the Bank was more than simply duped.  The Bank was made

-14-

aware of Rhodes' embezzlements -- at least in other accounts -- and allowed him to continue to bank there for six months, causing another $200,000 in loss to plaintiff.  The plaintiff, however, does not cite a single case to support its conclusion that this conduct qualifies as a CUTPA violation.  I decline to blaze new trails here as well.  The Bank's conduct vis a vis Rhodes may have caused injury to VIP, but there is no evidence of the kind of oppressive or unscrupulous behavior that the case law demands.  See A-G Foods, 216 Conn. at 217 (noting that the defendant's negligence did not constitute an "immoral, unethical, oppressive or unscrupulous" practice).  That the defendant violated its own internal policies does not necessarily mean that it violated public policy.  See Lester, 2009 WL 5698131, at *8.  As in Lester, the plaintiff here has not established facts sufficient to survive summary judgment.

Defendant's motion for summary judgment is GRANTED vis a vis the plaintiff's CUTPA claim.

### IV. CONCLUSION

For the reasons stated above, I **DENY** Plaintiff's Motion for Partial Summary Judgment (document #71); and I **GRANT in part and DENY in part** Defendant's Motion for Summary Judgment (document #68).

**SO ORDERED.**

**Date: February 11, 2011**         /s/ Nancy Gertner
                                    **NANCY GERTNER, U.S.D.J.**